UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIEL HORACEK,                              Case No. 07-13822

            Plaintiff,                 Avern Cohn
vs.                                          United States District Judge

DERRICK WILSON, *et al*,                     Michael Hluchaniuk
                                             United States Magistrate Judge

            Defendants.
_____/

**REPORT AND RECOMMENDATION**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 72)**

## I.      PROCEDURAL HISTORY

This matter involves civil rights claims asserted by plaintiff, a prisoner in

the custody of the State of Michigan against defendants, who are various

employees and contractors of the Oakland County Sheriff's Department and Jail.

(Dkt. 1).  Plaintiff's claims involve religious-based food service issues, the failure

to provide certain accommodations relating to his purported disability, and also

safety and security issues.  *Id*.  All defendants have been sued in their individual

capacities.  (Dkt. 1).[1]  Defendants filed an answer to the complaint on November

---

[1] On December 29, 2008, plaintiff filed a motion for leave to amend his
complaint to assert his RLUIPA claim against defendants in their official, not
individual capacity.  (Dkt. 85).

20, 2007.  (Dkt. 13).  District Judge Avern Cohn referred this matter to Magistrate

Judge Paul J. Komives for all pretrial purposes on September 20, 2007.  (Dkt. 7).

This matter was reassigned to the undersigned on January 14, 2008.  (Dkt. 17).

Defendants Atkins, Devaney, Wallace, the Oakland County Jail

Administrator, and the Oakland County Classification Department (collectively,

"Oakland County defendants"), filed a motion for summary judgment on

September 30, 2008.  (Dkt. 72).  Plaintiff moved for an extension of time to file a

response, which was granted until November 19, 2008.  (Dkt. 73, 75).  Plaintiff

filed a second motion for extension of time to respond, which was granted until

December 19, 2008.  (Dkt. 76, 78).  On December 30, 2008, plaintiff filed his

response.  (Dkt. 88).  Defendants were granted until January 27, 2009 to file their

reply brief.  (Dkt. 89 and Text-Only Order dated 1/13/09).  Defendants filed their

reply on January 27, 2009.  (Dkt. 95).

Defendants' motion for summary judgment is now ready for Report and

Recommendation.  For the reasons set forth below, the undersigned

**RECOMMENDS** that defendants' motion for summary judgment be **GRANTED**

and that plaintiff's state law claims be **DISMISSED** without prejudice.

## II.    STATEMENT OF FACTS

Plaintiff was hospitalized on June 24, 2005, due to injuries he sustained in a

car accident and was discharged to the Oakland County Jail on June 27, 2005. (Dkt. 72, Ex. A, pp. 21, 23; Ex. B).  Plaintiff was initially housed in a cell located in the jail clinic.  (Dkt. 72, Ex. A, p. 23; Ex. B).  During the time he was housed in the jail clinic, plaintiff was confined to a bed.  (Dkt. 72, Ex. A, p. 24).  He was then moved to the jail annex.  (Dkt. 72, Ex. A, p. 24; Ex. B).  The annex consists of a large day room with individual cells located around the perimeter.  Plaintiff had a wheelchair and a walker to enable him to move around.  (Dkt. 72, Ex. A, p. 25).  Plaintiff acknowledged that the shower in the annex was accessible to him. (Dkt. 72, Ex. A, p. 27).

On November 18, 2005, plaintiff was moved to a multi-person cell in the main jail.  (Dkt. 72, Ex. B).  Plaintiff complained about the multi-person cell because he believed it did not conform with restrictions placed on his activity due to his knee injury.  (Dkt. 72, Ex. A, p. 30).  Plaintiff claims he could not access the toilet, or would have to sit sideways, due to an inability to bend his leg because there was a metal plate in front of the toilet for privacy.  (Dkt. 72, Ex. A, p. 30). Plaintiff also asserted that he could not step up into the shower.  (Dkt. 72, Ex. A, p. 30).  Plaintiff indicated that he does not recall specific dates when he was moved to different locations in OCJ and would defer to jail records with regard to his placement.  (Dkt. 72, Ex. A, p. 32).  Two days later, on November 20, 2005,

plaintiff was moved to a single person cell, which was also located in the

main jail.  (Dkt. 72, Ex. B).  Plaintiff attributes this move to a nurse observing his

difficulties in the multi-person cell.  (Dkt. 72, Ex. A, p. 31).  Plaintiff also fell

getting out of the shower on November 20, 2005.  On November 22, 2005,

plaintiff was moved back to the jail clinic.  (Dkt. 72, Ex. A, p. 46; Ex. B).  Plaintiff

admitted that his housing in the jail clinic provided him access to a shower and

toilet, but he complained because he could not walk around and exercise.  (Dkt.

72, Ex. A, p. 47).  He remained there until December 20, 2005, when he was

transferred to a 10-man cell.  (Dkt. 72, Ex. A, p. 47; Ex. B).  Plaintiff alleges that

he had difficulty using the shower and toilet in the 10-man cell.  (Dkt. 72, Ex. A,

pp. 47-48).  While housed there, defendant Atkins came to see plaintiff about his

issues regarding his incarceration.  (Dkt. 72, Ex. A, p. 49).  Shortly after speaking

with defendant Atkins, plaintiff was returned to the annex, on January 9, 2006.

(Dkt. 72, Ex. A, p. 50; Ex. B).

After an altercation with another inmate on March 4, 2006, plaintiff was

moved to a holding cell.  (Dkt. 72, Ex. B).  One week later he was housed in a

single-man cell, where he remained until April 19, 2006 when he was turned over

to the Metamora Police Department on a writ.  (Dkt. 72, Ex. A, p. 53; Ex. B).

Plaintiff returned to OCJ two days later and was housed in a 10-man cell.  (Dkt.

72, Ex. B).  He remained in that cell until being turned over to MDOC on July 6, 2006, with the exception of two days when he went to Lapeer on a writ.

Plaintiff complained that, throughout his incarceration, he was often subject to derogatory remarks from corrections staff and from food service staff, in particular defendant Mary (LNU).  (Dkt. 72, Ex. A, p. 54).  He also complained that his meals were unsealed, mixed, or reduced as retaliation for his complaints. (Dkt. 72, Ex. A, pp. 54-55).  After arriving at OCJ, Plaintiff requested a kosher diet.  (Dkt. 72, Ex. A, p. 35).  Plaintiff admits that he was placed on the list and received the kosher diet provided by Aramark, the food service company working at OCJ.  (Dkt. 72, Ex. A, p. 36).  Plaintiff took issue with the content of the kosher diet provided by Aramark.  (Dkt. 72, Ex. A, p. 37).  Plaintiff testified he spoke with a number of unidentified deputies about the contents of the kosher meals. (Dkt. 72, Ex. A, p. 37).  He also spoke with defendant Derrick Wilson on many occasions and identified Mr. Wilson as the person who ran Aramark Food Services at OCJ (Dkt. 72, Ex. A, p. 37).  Plaintiff also dealt with Mary from Aramark, who was the person who brought the trays most of the time.  (Dkt. 72, Ex. A, p. 37).  In addition, plaintiff testified that he discussed issues with the meals provided by Aramark with defendants DeVaney, Atkins, and Wallace.  (Dkt. 72, Ex. A, p. 37).

Report and Recommendation
Defendants' Motion for Summary Judgment
*Horacek v. Wilson*; 07-13822

Plaintiff testified that he filed grievances regarding the kosher meals he was receiving throughout his incarceration at OCJ. (Dkt. 72, Ex. A, p. 27). The first issue plaintiff complained about was that cooked food was served on the Sabbath. (Dkt. 72, Ex. A, pp. 28, 38). Plaintiff asserts that this grievance was denied (Dkt. 72, Ex. A, p. 28). He testified that the meal he was provided was certified kosher, but it was cooked on the Sabbath. (Dkt. 72, Ex. A, p. 38). He also complained about meals containing meat and dairy products for the same meal. (Dkt. 72, Ex. A, p. 38). Plaintiff indicated that he could eat meat or dairy at a given meal but could not have them both at the same meal. (Dkt. 72, Ex. A, pp. 38-39). Plaintiff also received meals where the seal on the packaging had been broken, which he contends renders the meal non-kosher, or the meal had been handled by a non-Jew, which also renders it non-kosher. (Dkt. 72, Ex. A, p. 39). Plaintiff testified at his deposition that on three occasions the items contained in the kosher meals were not kosher. (Dkt. 72, Ex. A, p. 40). Plaintiff complained about the meals he received during Passover. (Dkt. 72, Ex. A, p. 44). Plaintiff stated that items must be certified kosher for Passover. *Id*. In his response brief, plaintiff points to three meal labels that he says were served to him during Passover, claiming that they were non-kosher due to leavening and his kites explaining that he could not have any leavening (yeast, flour, or grain) during Passover. (Dkt. 88, p. 4, Exs. B, C,

D).  According to plaintiff, he would indicate to the deputy working that there was

a problem with his meal and the deputy would call food service and be told that

the meal provided is plaintiff's meal.  (Dkt. 72, Ex. A, p. 45).  In his response to

the motion for summary judgment, plaintiff asserts that out of thousands of meals

served to him at OCJ, only four or five meals were actually kosher.  (Dkt. 88, p. 3).

In support of this assertion, plaintiff provides a chart apparently detailing his

complaints at OCJ and the dates on which he submitted them.  (Dkt. 88, Ex. A).

While some of the entries are supported by accompanying documentation, it is not

clear from plaintiff's submission who prepared this chart, when it was prepared, or

whether its contents are accurate.

Plaintiff asserts that the food service company and Oakland County

employees are both liable for the contents of the kosher meals.  (Dkt. 72, Ex. A, p.

41).  Plaintiff also alleges he was retaliated against as a result of his complaints

regarding the kosher meals.  (Dkt. 72, Ex. A, p. 42).  Plaintiff stated that his TV

dinner meal trays would arrive broken, his food would be mixed within the sealed

container, and he received reduced portions.  (Dkt. 72, Ex. A, p. 42).  Plaintiff

did not attribute any of these actions to the Oakland County defendants but

referred to unnamed deputies and defendant Mary (LNU).  Plaintiff also contends

that his move out of the annex was in retaliation for his complaints about the

kosher meals.  (Dkt. 72, Ex. A, p. 43). In his response to defendants' motion for summary judgment, plaintiff points out that OCJ officials had a meeting regarding his kosher meal complaints and also have policy directives governing the kosher meal program.  (Dkt. 88, p. 5, Exs. E, F).  Plaintiff claims that the OCJ officials directed the food service contractor to stop serving him hot meals during Passover, but this did not happen, except on one occasion.  (Dkt. 88, p. 5).

Plaintiff was discharged from the hospital on June 27, 2005.  (Dkt. 72, Ex. E).  The initial clinic note indicates that plaintiff was partially weight-bearing and that his right leg was to stay mostly extended.  (Dkt. 72, Ex. E, p. 1). Plaintiff was prescribed Vicodin and Colace.  (Dkt. 72, Ex. E, p. 1).  Plaintiff required a follow-up visit with Dr. Fugle to remove staples, his regular diet could be resumed, ice was to be applied to knee, and the dressing was to be kept clean and dry.  (Dkt. 72, Ex. E, p. 161).  Plaintiff was examined in the clinic on July 1, 2005 and a prescription for Ultram was ordered.  (Dkt. 72, Ex. E, p. 3).  Records also indicate that his dressing was changed daily between July 1st and July 5th.  (Dkt. 72, Ex. E, p. 34).  Plaintiff was again seen by Dr. Fugle on July 5th and the staples were removed.  (Dkt. 72, Ex. E, p. 157).  The instructions provided for a daily shower, not bending the knee, wrapping the knee with an ace bandage and re-applying the dressing.  (Dkt. 72, Ex. E, p. 157).  Plaintiff was required to have another follow-

up in 30 days.  (Dkt. 72, Ex. E, p. 157).  There was no direction to continue ice on

the knee.  Plaintiff was provided with bandages for his daily dressing change and

advised to shower daily.  (Dkt. 72, Ex. E, p. 31).

Plaintiff was taken to the hospital on July 25, 2005 due to complaints of

abdominal pain.  (Dkt. 72, Ex. E, pp. 32, 81, 121-134).  On August 9, 2005,

plaintiff was again seen by Dr. Fugle.  The incision was noted to be well healed,

x-rays showed good alignment, he was instructed to wean himself from the walker,

and the knee brace was adjusted to permit 30 degrees of motion.  (Dkt. 72, Ex. E,

p. 107).  The next follow-up visit with Dr. Fugle occurred on September 20, 2005.

The instructions were to remove the brace in one week, to use an ace bandage to

wrap the knee, and to avoid sports or running.  (Dkt. 72, Ex. E, p. 79).  The jail

clinic note from the same day indicates that plaintiff was able to bear weight

without difficulty.  (Dkt. 72, Ex. E, p. 7).  The next follow-up visit was on October

18, 2005.  Dr. Fugle ordered physical therapy three times per week for four weeks

for strengthening and rigid exercises.  (Dkt. 72, Ex. E, p. 106).  The initial

evaluation for physical therapy was done on October 25, 2008.  (Dkt. 72, Ex. E, p.

105).  At the initial visit, plaintiff was provided with a home exercise plan

detailing his various exercises.  (Dkt. 72, Ex. E, pp. 118-119).  Plaintiff attended

physical therapy on October 25, November 2, 8, 9, 18, 29, and 30, December 6, 7,

9, 13, and 15.  (Dkt. 72, Ex. E, pp. 109-110).  During this time, plaintiff was also seen in the clinic on November 3, when he claimed that something fell on his knee in the shower.  (Dkt. 72, Ex. E, p. 29).  The doctor was notified and plaintiff was given an ice-pack and instructed to keep his knee elevated.  On November 4, the clinic contacted Dr. Fugle regarding plaintiff's use of a cane or walker and was informed that Dr. Fugle wanted plaintiff to exercise.  (Dkt. 72, Ex. E, p. 9).  On November 8, plaintiff was provided with a cane.  (Dkt. 72, Ex. E, p. 9).

Plaintiff filed various grievances during this time asserting that he was not receiving physical therapy and that he was not receiving ice for his knee.  Plaintiff stated that Dr. Fugle ordered ice to be provided in June or July and that he had never received any ice.  (Dkt. 72, Ex. E, p. 44).  The response to this grievance indicated that there was no standing order for ice and none of Dr. Fugle's instructions from any follow-up visits indicate that ice was to be provided.  (Dkt. 72, Ex. E, p. 43).  On November 20, 2005, plaintiff was taken to the jail clinic after reporting he fell in the shower.  (Dkt. 72, Ex. E, p. 30).  No redness or swelling was noted.  Plaintiff refused to stay in the clinic stating that he would be more comfortable in his own bed.  (Dkt. 72, Ex. E, p. 30). On November 22, 2005 Dr. Fugle indicated that plaintiff needed to exercise, have no contact with other inmates, have a shower mat inside and outside the shower, and a step no greater

than eight inches.  (Dkt. 72, Ex. E, p. 104).

Plaintiff was again seen by Dr. Fugle on December 20, 2005.  He recommended that plaintiff do exercises for flexion/extension and quad strengthening several time daily without any formal therapy.  (Dkt. 72, Ex. E, p. 60).  Dr. Fugle also removed plaintiff's orthopedic restrictions and indicated that he could be housed with other inmates.  (Dkt. 72, Ex. E, p. 60).  Plaintiff continued to follow-up with Dr. Fugle and eventually the hardware was removed from his knee.  (Dkt. 72, Ex. E, pp. 50, 56-57, 84-86, 88-93).  Plaintiff also received testing before the surgery to remove the hardware such as EKG, EEG, and an ultrasound.  (Dkt. 72, Ex. E, pp. 51-54, 94, 96-97).  Plaintiff claims that, due to his disability, he could not lay down on the floor or get up without assistance, pointing to a medical care grievance from March, 2006.  (Dkt. 88, p. 12; Ex. L).

Plaintiff estimated that he had between six and 12 conversations with Captain Wallace about his transfers, the cooked meals on the Sabbath, and about his conditions in general.  (Dkt. 72, Ex. A, pp. 58, 60).  According to plaintiff, Captain Wallace's response would be that he would look into it.  (Dkt. 72, Ex. A, p. 60). Plaintiff also testified that he had many discussions with Lt. Atkins beginning in January 2006.  (Dkt. 72, Ex. A, pp. 60-61).  According to plaintiff, he

discussed the issues regarding the kosher meals with Lt. Atkins and discussed

Jewish tenets in detail.  (Dkt. 72, Ex. A, pp. 62-63).  With regard to hot meals on

the Sabbath, plaintiff testified that a supervisor named Caswell stopped the hot

meals on the Sabbath.  (Dkt. 72, Ex. A, p. 63).

Plaintiff named Sister Peggy Devaney as a defendant because she was the

jail chaplain to whom he had sent kites (written communications/complaints in

OCJ) regarding issues with kosher meals.  (Dkt. 72, Ex. A, pp. 64-65).  According

to plaintiff, he had two conversations with Sister Peggy, who told plaintiff in

person during both conversations and responded in writing to his kites that she had

referred the matter to the Jewish representative, Rabbi Nelson.  (Dkt. 72, Ex. A, p.

68-70).  Rabbi Nelson was consulted on plaintiff's complaints about the kosher

diet and he reviewed the program in place at OCJ.  On January 19, 2006, Lt.

Atkins wrote a response to plaintiff's grievance:

> At the time I received this grievance I spoke with you
> regarding your concerns. I told you it would take
> additional time to thoroughly research this. Since we
> spoke, I have been actively monitoring the kosher diets
> with the facility. I found we are doing everything we can
> possibly do to accommodate your religious diet. We
> went to the extent of bringing in Rabbi Nelson to review
> our procedures. He agreed that we are doing everything
> we possibly can do. I will continue to monitor the kosher
> diets, and as concerns arrive, feel free to contact me.

(Dkt. 72, Ex. C).  Defendants assert that plaintiff admitted that action was taken in response to his complaints about the kosher meals.  (Dkt. 72, Ex. A, p. 80). Plaintiff asserts that he had a meeting with Rabbi Nelson in which Rabbi Nelson expressed his "shock" that all the violations were continuing.  (Dkt. 88, p. 15). According to plaintiff, even if Rabbi Nelson had "approved" the kosher food program at the jail, defendants must have lied to Rabbi Nelson, or they would have corrected the program as he instructed.  *Id*.

Plaintiff also identified the jail administrator and the classification department as defendants in this matter but admits that he never had any conversations with these individuals.  Rather, he testified that he identified classification because they moved him out of the annex.  (Dkt. 72, Ex. A, p. 71). Plaintiff testified that he identified the jail administrator because of an alleged meeting he cannot state actually occurred.  (Dkt. 72, Ex. A, pp. 70-71).

Plaintiff also raises an issue with regard to his ability to wear a yarmulke while at OCJ.  Plaintiff was given the yarmulke by a jail volunteer and shortly thereafter he was told to take it off by jail personnel.  (Dkt. 72, Ex. A, p. 74). Plaintiff filed a grievance and was informed that he could wear his yarmulke in his individual cell, but could not wear it in the day room or anywhere with other prisoners.  (Dkt. 72, Ex. A, p. 75).  Plaintiff was also told that if he wished to wear

his yarmulke during meals he would be allowed to do so provided he ate his meal in his individual cell.  (Dkt. 72, Ex. A, p. 75).  The response to plaintiff's grievance indicated that wearing the yarmulke or anything religious in the day room will cause a security and safety issue.  (Dkt. 72, Ex. A, p. 81).  Plaintiff asserts that Christian inmates were permitted to wear rosaries in the "pod area" while he was not permitted to wear his yarmulke in that same area.  (Dkt. 88, p. 12, Ex. K).

## III.   DISCUSSION

### A.   Standard of Review

Summary judgment is appropriate under Rule 56(b) "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  In *Copeland v. Machulis*, 57 F.3d 476, 478-79 (6th Cir. 1995), the court stated the standard for deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case.  Once the moving party has met its burden of production, the non-moving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment.  The mere existence of a scintilla

> of evidence to support plaintiff's position will be
> insufficient; there must be evidence on which the jury
> could reasonably find for the plaintiff.

A genuine issue of material fact exists only when, assuming the truth of the non-moving party's evidence and construing all inferences from that evidence in the light most favorable to the non-moving party, there is sufficient evidence for a trier of fact to find for the non-moving party. *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

"In deciding a motion for summary judgment, [the] court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). This is not to say that some credibility determinations are beyond what is appropriate in deciding a motion for summary judgment. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 127 S.Ct. 1774, 1776 (2007).

Rule 56 limits the materials the Court may consider in deciding a motion under the rule: "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th

15

Cir. 1995) (citation omitted).  Moreover, affidavits must meet certain

requirements:

> A supporting or opposing affidavit must be made on
> personal knowledge, set out facts that would be
> admissible in evidence, and show that the affiant is
> competent to testify on the matters stated. If a paper or
> part of a paper is referred to in an affidavit, a sworn or
> certified copy must be attached to or served with the
> affidavit. The court may permit an affidavit to be
> supplemented or opposed by depositions, answers to
> interrogatories, or additional affidavits.

Fed.R.Civ.P. 56(e)(1).  In accordance with Rule 56(e), the Sixth Circuit has held

"that documents submitted in support of a motion for summary judgment must

satisfy the requirements of Rule 56(e); otherwise, they must be disregarded."

*Moore v. Holbrook,* 2 F.3d 697, 699 (6th Cir. 1993).  Thus, in resolving a Rule 56

motion, the Court should not consider unsworn or uncertified documents, *Id.,*

unsworn statements, *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 968-969

(6th Cir. 1991), inadmissible expert testimony, *North American Specialty Ins. Co.*

*v. Myers*, 111 F.3d 1273, 1280 (6th Cir. 1997), or hearsay evidence, *Hartsel v.*

*Keys*, 87 F.3d 795, 799 (6th Cir. 1996); *Wiley v. United States*, 20 F.3d 222,

225-226 (6th Cir. 1994).  *See Tolliver v. Federal Republic of Nigeria*, 265

F.Supp.2d 873, 879 (W.D. Mich. 2003).  Thus, "[a] party opposing a motion for

summary judgment cannot use hearsay or other inadmissible evidence to create a

genuine issue of material fact." *Id*., quoting, *Sperle v. Michigan Dept. of Corrections*, 297 F.3d 483, 495 (6th Cir. 2002) (citation and quotation marks omitted).

    B.    <u>First Amendment - Religious Exercise and RLUIPA</u>

    1.    Legal principles

Prison inmates are entitled to the protection of the First Amendment, including the free exercise clause. *O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987). However, an inmate's constitutionally protected rights, including his First Amendment rights, must be balanced against the institution's need to maintain security and order within the prison. In *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court held that prison regulations may infringe on a prisoner's constitutional rights as long as they are rationally related to a legitimate penological concern. In the context of the First Amendment free exercise clause, "[a] prisoner alleging that the actions of prison officials violate his religious beliefs must show that 'the belief or practice asserted is religious in the person's own scheme of things' and is 'sincerely held.'" *Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001), quoting, *Kent v. Johnson*, 821 F.2d 1220, 1224 (6th Cir. 1987). "A religious belief which is not sincerely held or a belief which is purely secular does not require the prison to consider accommodation." *Mosier v.*

*Maynard, D.O.C.*, 937 F.2d 1521, 1526 (10th Cir. 1991), citing, *Johnson v. Moore*, 926 F.2d 921, 923 (9th Cir. 1991).

The RLUIPA states in pertinent part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).  Thus, a more stringent, less deferential standard is applied to a RLUIPA claim (the least restrictive means of furthering a compelling governmental interest) than to a First Amendment § 1983 claim (reasonably related to legitimate penological interests).  *See Cutter v. Wilkinson*, 544 U.S. 709 (2005).  Under RLUIPA, the initial burden of showing a substantial burden on a religious practice lies with the plaintiff.  42 U.S.C. § 2000cc-2(b).[2]  The burden

---

[2]  Plaintiff has filed a motion to amend his complaint primarily to assert his RLUIPA claim against defendants in their official capacity, rather than their personal capacity.  The undersigned suggests that this does not affect the merits of plaintiff's RLUIPA claim.  In *Price v. Caruso*, 451 F.Supp.2d 889, 895, 904, n. 6 (E.D. Mich. 2006), the court found that a RLUIPA claim would only lie against defendants named in their official capacities, not their individual capacities.  However, the Sixth Circuit has at least implicitly acknowledged that a RLUIPA action can be brought against defendants named in their individual capacities.  *See*

then shifts to the government to demonstrate that the compelling interest test is

satisfied.  *See id.*  A governmental practice, decision or regulation imposes a

"substantial burden" on the exercise of religion "if it truly pressures the adherent

to significantly modify his religious behavior and significantly violate his religious

beliefs."  *Adkins v. Kaspar*, 393 F.3d 559, 569-70 (5th Cir. 2004).  Stated

differently by the Seventh Circuit, "a substantial burden on religious exercise is

one that necessarily bears direct, primary, and fundamental responsibility for

rendering religious exercise ... effectively impracticable."  *Civil Liberties for

Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003).

Thus, once it is determined that a regulation imposes a substantial burden on

a prisoner, the review of that burden under the Free Exercise Clause differs from

RLUIPA.  *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 814 (8th Cir. 2008),

citing, *Cutter v. Wilkinson*, 544 U.S. 709, 714 (2005).  Such reviews need not be

reached where the plaintiff "has not put forth sufficient evidence that a reasonable

---

*Figel v. Overton*, 263 Fed.Appx. 456, 458-459 (6th Cir. 2008), applying a
qualified immunity analysis to a RLUIPA claim.  Qualified immunity is a defense
only available to individual defendants, not to a state or municipality, or
defendants sued in their official capacities.  *Kentucky v. Graham*, 473 U.S. 159
(1985); *Farnsworth v. Baxter*, 2007 WL 2793364, *2 (W.D. Tenn. 2007).  Thus, a
RLUIPA claim can be brought against a defendant sued both in his individual and
official capacities.

jury could conclude that his ability to practice his religion has been substantially burdened." *Patel*, 515 F.3d at 814.

2.      Religious diet

In this case, the undersigned suggests that plaintiff has not made a showing of a substantial burden. Defendants argue that its food service policy does not impinge on plaintiff's constitutional rights and, even if it did, the regulation is still valid because it is reasonably related to legitimate penological interests. (Dkt. 72, citing, *Turner v. Safley*, 482 U.S. 78, 89 (1987); *Kahey v. Jones*, 836 F.2d 948, 950 (5th Cir. 1988) (prison has a legitimate governmental interest in running a simplified prison food service rather than a full scale restaurant)). According to defendants, the policy in place at OCJ allows inmates to obtain a special diet based on religious beliefs. The policy further states that the Food Service Manager is responsible for compliance with applicable standards pertaining to food service preparation, including special diets. (Dkt. 72; Ex. G). According to defendants, plaintiff's complaints that his kosher meals were occasionally not properly prepared or presented do not qualify as a substantial burden because they cannot be considered to significantly inhibit or constrain an expression that is a central tenent to his religious beliefs. (Dkt 72, citing, *Patel, supra*).

Plaintiff argues that he was forced to choose between adhering to his

religious beliefs and starvation, which is a substantial burden on his religious beliefs and significantly inhibited his religious expression.  (Dkt. 88, pp. 2-3).  In his response to the motion for summary judgment, plaintiff asserts that out of thousands of meals served to him at OCJ, only four or five meals were actually kosher.  (Dkt. 88, p. 3).  In support of this assertion, plaintiff provides a chart apparently detailing his complaints at OCJ and the dates on which he submitted them.  (Dkt. 88, Ex. A).  While some of the entries are supported by accompanying documentation, it is not clear from plaintiff's submission who prepared this chart, when it was prepared, or whether its contents are accurate.  The undersigned suggests that this evidence does not comply with Rule 56.

While plaintiff makes several claims regarding the inadequacy of the kosher diet service offered at OCJ, he does not offer any evidence, other than his own personal opinion, that the meals served to him did not comply with a kosher diet. Plaintiff testified at his deposition that on three occasions the items contained in the kosher meals were not kosher.  (Dkt. 72, Ex. A, p. 40).  In his response brief, plaintiff points to three meal labels that he says were served to him during Passover, claiming that they were non-kosher due to leavening and his kites explaining that he could not have any leavening (yeast, flour, or grain) during Passover.  (Dkt. 88, p. 4, Exs. B, C, D).  Plaintiff does not offer any affidavits to

support his claims. Indeed, plaintiff claims that he had a meeting with Rabbi Nelson in which Rabbi Nelson expressed his "shock" that all the violations were continuing. (Dkt. 88, p. 15). And, according to plaintiff, even if Rabbi Nelson had "approved" the kosher food program at the jail, defendants must have lied to Rabbi Nelson, or they would have corrected the program as he instructed. *Id.* Plaintiff offers no evidence whatsoever that Rabbi Nelson disapproved of the kosher diet program at OCJ or that OCJ officials failed to follow Rabbi's Nelson's advice. Indeed, evidence offered by defendants is to the contrary.

This is not a case, as is typical for First Amendment/RLUIPA cases, where an inmate has been denied his request for a religious diet. Rather, plaintiff's request was granted, and the evidence shows that OCJ officials responded to his concerns about individual meals and consulted with a rabbi on multiple occasions to address plaintiff's needs and concerns. Perhaps the OCJ kosher diet program as applied to plaintiff was imperfect, but the undersigned suggests that plaintiff has brought forth no evidence to show that the program itself or as implemented with respect to plaintiff, imposed a substantial burden on plaintiff's practice of his religion.

### 3. Wearing of yarmulke outside prison cell

Defendants argue that plaintiff's claim regarding his ability to wear a

yarmulke fails for similar reasons.  Defendant cite their answers to discovery,

which state, in part:

> It is the policy of the Oakland County Sheriffs
> Department that Pod Rule No. 23, "Rosaries are not
> allowed to be worn outside the pod area" applies to all
> religious symbols.  All inmates are restricted from
> displaying religious symbols outside their cell.  This rule
> is in place for the inmates' safety to avoid any violence
> between inmates of different religious beliefs.

(Dkt. 72, Ex. H).  Defendants asserts that, under the *Turner* factors, the limitation

on where plaintiff can wear his yarmulke does not violate his constitutional rights.

Defendants point to *Young v. Lane, 922 F.2d 370, 375 (7th Cir. 1991)*, which

upheld a prison regulation that limited the ability to wear a yarmulke to inside an

inmate's cell and during religious services based on security concerns.  The court

also noted a governmental agency's strong interest in uniform dress regulations.

*Id*.  Moreover, in accordance with *Turner*, the regulation does not preclude an

inmate from wearing a religious symbol in his cell and, therefore, according to

defendants, provides an alternative means for the inmate to exercise his religious

beliefs.

Plaintiff argues that defendants have not shown a legitimate penological

interest, in that they fail to offer any evidence of actual violence that has occurred

based on inmates wearing religious symbols.  (Dkt. 88, pp. 7-9).  Defendants

point to *Young v. Lane*, 922 F.2d 370 (1991), which held that a prison's refusal to

allow Jewish inmates to wear yarmulkes other than in their cells and during

religious services was not a violation of the Jewish inmates' right to the free

exercise of their religion. The court noted that, in addition to security,

governmental agencies such as prisons have "a strong interest in uniform dress

regulations." *Young*, 922 F.2d at 375.  Non-uniform dress regulations would

create the risk of "undesirable consequences associated with perceived

favoritism." *Id.* at  377.  The undersigned suggests that, to the extent defendants

have infringed on plaintiff's constitutional rights, the policy is rationally related to

a legitimate penological concern.

Plaintiff also insists that defendants permitted other inmates to wear

religious ornaments, such as rosaries, outside of their cells.  (Dkt. 88, pp. 7-9).

Plaintiff offers no evidence, other than his bare statement, that this actually

occurred.  While the policy states that "[r]osaries are not allowed to be worn

outside the pod area," defendants offer evidence suggesting that this policy was

interpreted and applied to restrict from "displaying religious symbols outside their

cell." (Dkt. 72, Ex. H).  To the extent that this argument posited by plaintiff

relates to his free exercise/RLUIPA claim, plaintiff has not offered any evidence

showing that the policy was not applied as stated by defendants.

Report and Recommendation
Defendants' Motion for Summary Judgment
*Horacek v. Wilson*; 07-13822

      4.     Federal financial assistance

Defendants also argued that plaintiff's RLUIPA claim is easily disposed of because the food service program at OCJ does not receive federal financial assistance as required by RLUIPA. Given the above conclusions that plaintiff failed to establish any substantial burden, it is not strictly necessary to reach this issue, but in the interest of completeness, the undersigned will do so. The act applies when the alleged substantial burden is imposed in a "program or activity" that receives federal financial assistance. 42 U.S.C. § 2000cc-1(b). Defendants offer the affidavit of Charles Snarey attesting that the food service at OCJ is provided pursuant to contract and that no federal financing is utilized to provide the food service at OCJ. (Dkt. 72).

The undersigned suggests that the affidavit of Mr. Snarey is insufficient to defeat plaintiff's RLUIPA claim. The terms "program or activity" includes "all the operations of...a department or agency, special purpose district, or other instrumentality of local government." 42 U.S.C. § 2000d-4a(1)(A). Section 3 applies if "the substantial burden [on religious exercise] is imposed in a program or activity that receives Federal financial assistance." 42 U.S.C. § 2000cc-1(b)(1). In the prison context, this section sweeps broadly, as "[e]very State ... accepts federal funding for its prisons." *Cutter v. Wilkinson*, 544 U.S. 709, 716 n. 4

(2005). Defendants' interpretation is contrary to cases within this circuit stating that federal funding to a particular department or agency of state government, like the Michigan Department of Corrections, bring that agency within the scope of RLUIPA. *See e.g.*, *Berryman v. Granholm*, 2007 WL 2259334, *9 (E.D. Mich. 2007)*, quoting, *Kaufman v. Carter*, 952 F.Supp. 520, 527 (W.D. Mich. 1996) ("It is not disputed that the Michigan Department of Corrections receives federal financial assistance."). In this case, defendants do not offer any evidence suggesting that the OCJ receives no federal funding. In the absence of such evidence, the undersigned is constrained to conclude that the OCJ is a "department or agency, special purpose district, or other instrumentality of local government."

 C. <u>First Amendment Retaliation</u>

 Defendants argue that plaintiff did not engage in protected conduct because his actions in filing kites and grievances related to his own personal circumstances and were not a matter of "public concern." Defendants also argue that plaintiff fails to identify any "adverse action" by them; plaintiff does not offer any evidence that defendants altered or damaged the meals received by plaintiff or that they took any adverse action in response to plaintiff's complaints about his kosher meals or his exercise of his religious beliefs.

 Plaintiff argues that "most of the retaliation the plaintiff was subjected to

occurred immediately after the plaintiff's original suit regarding First Amendment violations was received by defendant Devaney...a defendant currently before this Court in this matter."  (Dkt. 88, p. 21).  Plaintiff points to the following "time-line" of events in order to establish his retaliation claim: (1) his original religious discrimination against defendants Devaney, Wilson, and Mary LNU was filed on September 29, 2005; (2) service on defendant Devaney was ordered on October 27, 2005; (3) the U.S. Marshal's Service sent the complaint and waiver of summons to defendant Devaney on October 28, 2005; and (4) on November 18, 2005, plaintiff was "suddenly" removed from his accessible housing to non-accessible housing.  (Dkt. 88, p. 21).

A prisoner retains First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.  See *Pell v. Procunier*, 417 U.S. 817, 822 (1974).  Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution.  See *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).  To establish a First Amendment retaliation claim, the plaintiff must prove that: (1) the plaintiff engaged in activities protected by the Constitution or statute; (2) the defendant took an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) that this adverse action was taken at

least in part because of the exercise of the protected conduct. *Id.* "[I]f a prisoner violates a legitimate prison regulation, he is not engaged in 'protected conduct,' and cannot proceed beyond step one." *Id.* at 395.

Moreover, the plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). If the plaintiff is able to make such a showing, the defendant then has the burden of showing that the same action would have been taken even absent the plaintiff's protected conduct. *Id.*; *Thaddeus-X*, 175 F.3d at 399. Such conclusory allegations are insufficient to show that defendants were motivated by plaintiff's exercise of his First Amendment rights. *Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996); *see also Skinner v. Bolden*, 89 Fed.Appx. 579 (6th Cir. 2004) ("[C]onclusory allegations of temporal proximity are not sufficient to show a retaliatory motive."). The undersigned suggests that plaintiff has offered no evidence whatsoever connecting the alleged retaliatory acts to the filing of plaintiff's lawsuit.

    D.    Equal Protection and Discrimination

Defendants argue that there is no evidence in this case to support the claim that they acted with the intent or purpose to discriminate against plaintiff because

28

of his religion or that he was treated differently than similarly situated inmates.

Defendants assert that plaintiff's claims are just like those rejected in *Patel*, where

an inmate requested a halal diet to conform to his Muslim beliefs.  The Court

rejected the inmate's equal protection claims because the prison officials consulted

with religious leaders, including Muslims, and reasonably believed they had

accommodated his needs.  The Court concluded: "If anything, the evidence

supports only one conclusion: that the Bureau Defendants' intention was to

accommodate all religious beliefs, not to discriminate against certain beliefs."  *Id*.

Defendants argue that they consulted with Rabbi Nelson and believed they were

doing everything possible to accommodate plaintiff's kosher diet requests.  Thus,

defendants argue that plaintiff's Equal Protection claim should be dismissed for

the same reasons that the plaintiff's claim in *Patel* was dismissed.  Defendants also

argue that the same is true if plaintiff attempts to assert an Equal Protection claim

with regard to wearing his yarmulke.  Defendants' argue that plaintiff has no

evidence to support a discriminatory intent on the part of defendants, given that

the restriction regarding wearing religious symbols outside an inmate's cell

applied equally to all inmates.  (Dkt. 72; Ex. H).

Plaintiff claims that he was not allowed to wear his yarmulke in the pod

dayroom, while other prisoners were permitted to wear religious symbols, such as

rosaries, in the dayroom.  (Dkt. 88, pp. 14-16, citing Exs. H, K).  While the policy states that "[r]osaries are not allowed to be worn outside the pod area," defendants offer evidence suggesting that this policy was interpreted and applied to restrict from "displaying religious symbols outside their cell."  (Dkt. 72, Ex. H).  Plaintiff has not offered any evidence showing that the policy was not applied as stated by defendants in their discovery responses.  Thus, the undersigned suggests that plaintiff's equal protection claim must fail.

     E.    <u>Deliberate Indifference</u>

The Supreme Court has recognized the responsibility of the courts "to scrutinize claims of cruel and unusual confinement."  *Rhodes v. Chapman*, 452 U.S. 337, 352 (1981).  Included as a type of conduct that violates the Eighth Amendment is a prison official's deliberate indifference to a prisoner's serious medical needs.  *See e.g.*, *Estelle v. Gamble*, 429 U.S. 97 (1976); *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976).  To succeed on a claim of deliberate indifference, plaintiff must satisfy two elements, an objective one and a subjective one.  He must show that he had a serious medical need and he must show that a defendant, being aware of that need, acted with deliberate indifference to it.  *Wilson v. Seiter*, 501 U.S. 294, 300 (1991).

A medical need is "serious" if it has been diagnosed by a physician as

requiring treatment or is so obvious that a lay person would easily recognize the necessity for a doctor's attention. *Monmouth County Correctional Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir.), cert. denied, 486 U.S. 1006 (1988). As stated in *Monmouth*, a serious medical need is one that has been diagnosed by a physician *as requiring treatment*. Plaintiff condition obviously required treatment and such treatment was given. Thus, plaintiff's claim boils down to whether his treatment was "woefully inadequate."

"Deliberate indifference" has been variously defined by the federal courts that have considered prisoners' Eighth Amendment claims, but all agree that it is more than mere negligence and less than actual intent in the form of "malicious" or "sadistic" action. *Farmer v. Brennan*, 511 U.S. 825, 861 (1994); *see also Estelle*, 429 U.S. at 105-106 (a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim under the Eighth Amendment; "medical malpractice does not become a constitutional violation merely because the victim is a prisoner"); *Sanderfer v. Nichols*, 62 F.3d 151, 154 (6th Cir. 1995) (deliberate indifference is the equivalent of "criminal recklessness, which requires a subjective showing that the defendant was aware of the risk of harm"); *Gibson v. Foltz*, 963 F.2d 851, 853 (6th Cir. 1992) ("[o]bduracy or wantonness, not inadvertence or good faith error, characterizes deliberate

indifference").

As noted in *Estelle*, "[i]n order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106.  An allegation of mere negligence in diagnosis or treatment is not actionable under § 1983. *Estelle v. Gamble, supra*; *Byrd v. Wilson*, 701 F.2d at 595 n. 2.  Further, a claim of inadequate medical treatment may state a constitutional claim only if the treatment rendered is "so woefully inadequate as to amount to no treatment at all." *Westlake v. Lucas*, 537 F.2d 857, 860-861 (6th Cir. 1976).

Defendants argue that plaintiff's claims regarding his conditions of confinement also fall short of an Eighth Amendment deliberate indifference claim. Defendants argue that plaintiff's temporary difficulty taking a shower or having to sit sideways on the toilet for a short period of time because he was unable to bend his knee, do not rise to the level a deprivation of the minimal civilized measures of life's necessities.

Plaintiff claims that he was placed in inaccessible housing for almost five months, not less than 24 days as claimed by defendants.  In support of his claim, plaintiff cites to Exhibit N attached to his response.  (Dkt. 88; Ex. N).  Exhibit N is a time-line, apparently prepared by plaintiff, showing where he was housed during

his incarceration at OCJ and whether each location was accessible. There are no back-up documents showing from where this information was purportedly extracted.

In any event, on December 20, 2005, Dr. Fugle removed plaintiff's orthopedic restrictions and indicated that he could be housed with other inmates. (Dkt. 72, Ex. E, p. 60). According to plaintiff's own time-line, he was placed in non-accessible housing from November 18-21, 2005. (Dkt. 88, Ex. N). Plaintiff was then placed in accessible housing until Dr. Fugle removed all orthopedic restrictions.[3] Thus, the undersigned suggests that plaintiff's placement in inaccessible housing for four days does not rise to the level of a constitutional deprivation. Plaintiff also claims that he was denied ice packs for his knee, which were necessary for healing and pain management. (Dkt. 88, p. 18; Ex. M). Nothing in Exhibit M, however, suggests that plaintiff was ever denied ice or complained about a lack of ice. In reality, plaintiff's claim and evidence establish nothing more than a mere difference of opinion with the medical providers'

_____

[3] Notably, plaintiff offers two contradictory interpretations of Dr. Fugle's note removing his orthopedic restrictions. In his brief, plaintiff argues that Dr. Fugle's note says no such thing. In Exhibit N, plaintiff asserts that Dr. Fugle's order was done at plaintiff's request because, while clinic housing accommodated his accessibility needs, he was precluded from accessing the law library and the prisoner commissary while housed in the clinic. (Dkt. 88; Ex. N).

assessment of his physical abilities and restrictions.  *See Thomas v. Coble*, 55 Fed.Appx. 748, 749 (6th Cir. 2003) ("[Plaintiff] and Dr. Coble clearly disagreed over the preferred medication to treat [Plaintiff's] pain.  However, this difference of opinion does not support an Eighth Amendment claim.").  Under these circumstances, plaintiff has not established that any defendants were deliberately indifferent to a serious risk of harm.

F.     Due Process

The "Fourteenth Amendment protects only against abuse of executive power which shocks the conscience." *Sperle v. Michigan Department Corrections*, 297 F.3d 483, 491 (6th Cir. 2002) (citations and internal quotation marks omitted).  Simple negligence does not rise to the level of a substantive due process violation.  *Id.*  Defendants argue that plaintiff has not identified any conduct by defendants that satisfies the requisite standard of "shocking the conscience."  Plaintiffs request for kosher meals was granted.  When plaintiff complained about the specific content of some of the meals he received, defendants looked into his concerns and had them reviewed by Rabbi Nelson, who agreed that defendants' actions were appropriate.  Defendants argue that, at most, plaintiff's "claim that the kosher meals did not conform with his interpretation of his religion is an assertion of negligence on the part of the food service personnel

for failing to adhere to the requirements for kosher foods."  Defendants argue that

the conduct of OCJ personnel cannot does not satisfy the threshold for a

substantive due process claim.  Similarly, according to defendants, the application

of a jail rule that applies to all inmates regarding the display of religious symbols

outside of their cells also fails to satisfy the standard of "shocking the conscience.

Plaintiff argues that the fact that defendants knowingly continued to serve

him non-kosher food for over a year "shocks the conscience."  (Dkt. 88, p. 16).

Plaintiff also asserts that defendants' forcing him to wear his yarmulke only in his

cell also "shocks the conscience."  (Dkt. 88, p. 17).  Plaintiff further argues that his

placement in a non-accessible cell also "shocks the conscience."  (Dkt. 88, p. 17).

To establish a substantive due process claim, plaintiff must show that

defendants "possessed a purpose to cause harm, such that their actions were

sufficiently arbitrary and reckless that they shock the conscience." *Draw v. City of*

*Lincoln Park*, 491 F.3d 550, 555 (6th Cir. 2007), citing, *County of Sacramento v.*

*Lewis*, 523 U.S. 833, 849 (1998).  Even otherwise impermissible "conduct must

truly be extraordinary in nature to qualify as 'conscience shocking.'" *Draw*, 491

F.3d at 550.  As the Supreme Court held, "the due process guarantee does not

entail a body of constitutional law imposing liability whenever someone cloaked

with state authority causes harm." *Id.*, quoting, *Lewis*, 523 U.S. at 848.  The

Report and Recommendation
Defendants' Motion for Summary Judgment
*Horacek v. Wilson*; 07-13822

undersigned suggests that plaintiff has not offered any evidence that defendants

intended to cause him harm, or was arbitrary in any respect.  Thus, the

undersigned concludes that plaintiff has failed to show any behavior by defendants

that "shocks the conscience" and his due process claim must fails.

G.    ADA

It is well-established that public employees may not be sued in their

individual capacity under the ADA.  *Williams v. McLemore*, 247 Fed.Appx. 1 (6th

Cir. 2007); *see also Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 808, n. 1

(6th Cir. 1999) (holding that the ADA does not permit public employees or

supervisors to be sued in their individual capacity).  Plaintiff has only sued

defendants in their individual capacities.  While plaintiff's motion to amend his

complaint seeks to add the Oakland County Jail as a defendant, he has not sought

to bring his ADA claims against the defendants currently named in this suit in

their official capacity.  Thus, plaintiff's claims under the ADA against all

defendants in their individual capacity fail as a matter of law.

H.    Qualified Immunity

Defendants claim to be entitled to qualified immunity regarding their

actions in this case.  The doctrine of qualified immunity means that

"'[g]overnment officials performing discretionary functions generally are shielded

from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Caldwell v. Moore*, 968 F.2d 595, 599 (6th Cir. 1992), quoting, *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Defendants bear the burden of pleading qualified immunity, but plaintiff bears the burden of showing defendants are not entitled to qualified immunity. *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002).

The Supreme Court had established a two-part test in order to determine whether qualified immunity was applicable to a particular situation. *Saucier v. Katz*, 533 U.S. 194 (2001). The first part of the test involved a determination of whether the facts of the case, viewed in the light most favorable to the plaintiff, "show the officer's conduct violated a constitutional right." *Id*. at 201. If the first question was resolved in the affirmative then the court would decide "whether the right was clearly established." *Id*. If both questions are resolved in the affirmative, then the doctrine of qualified immunity does not apply and the case can proceed.

Very recently, and after the parties had submitted their motions in this case, the Supreme Court revisited their decision in *Saucier* and concluded that the mandatory order of the two-part test for determining if qualified immunity applied

was no longer sound based on several factors including judicial economy.

*Pearson v. Callahan*, — U.S. —, 2009 WL 128768 (2009).  While not modifying the factors that should be considered in such a decision, the Court held that sometimes it makes sense to allow the second part of the test to be decided first and that such a decision may resolve the controversy without having to address the first part of the test.  In *Pearson*, the § 1983 claim of the plaintiff was based on an allegedly unlawful search conducted by the defendant police officers.  Without having to engage in the perhaps more complicated decision of determining whether plaintiff's constitutional rights had been violated, the Court found that the constitutional right claimed by plaintiff was not clearly established where lower court case law was consistent with the conduct of the officers and "principles of qualified immunity [should] shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law."

With respect to plaintiff's claims, the factual allegations in plaintiff's complaint, even if true, do not violate plaintiff's constitutional rights.  Thus, the undersigned suggests that defendants are entitled to qualified immunity.

I.    State Law Claims

In light of the recommendations above, the undersigned also suggests that the Court decline to exercise supplemental jurisdiction over plaintiff's state law

claims.  *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) ("[I]f the

federal claims are dismissed before trial, ... the state claims should be dismissed as

well."); *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 521 (6th Cir. 2007)

("Generally, once a federal court has dismissed a plaintiff's federal law claim, it

should not reach state law claims.").  Thus, it is further recommended that

plaintiff's state law claims be dismissed without prejudice.

## IV.   RECOMMENDATION

For the foregoing reasons, the undersigned **RECOMMENDS** that

defendants' motion for summary judgment be **GRANTED** and that plaintiff's

state law claims be **DISMISSED** without prejudice.

The parties to this action may object to and seek review of this Report and

Recommendation, but are required to file any objections within 10 days of service,

as provided for in 28 U.S.C. § 636(b)(1) and Local Rule 72.1(d)(2).  Failure to file

specific objections constitutes a waiver of any further right of appeal.  *Thomas v.*

*Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d

505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others

with specificity will not preserve all the objections a party might have to this

Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931

F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829

Report and Recommendation
Defendants' Motion for Summary Judgment
*Horacek v. Wilson*; 07-13822

F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any

objections must be served on this Magistrate Judge.

Within 10 days of service of any objecting party's timely filed objections,

the opposing party may file a response.  The response must not exceed 20 pages in

length unless such page limit is extended by the Court.  The response must address

specifically, and in the same order raised, each issue contained within the

objections by motion and order.  If the Court determines any objections are

without merit, it may rule without awaiting the response to the objections.

Date:  March 3, 2009                           s/Michael Hluchaniuk_____
                                               Michael Hluchaniuk
                                               United States Magistrate Judge

## CERTIFICATE OF SERVICE

I certify that on March 3, 2009, I electronically filed the foregoing paper
with the Clerk of the Court using the ECF system, which will send electronic
notification to the following: Rick J. Patterson and Steven M. Potter and I certify
that I have mailed by United States Postal Service the paper to the following non-
ECF participants: Daniel Horacek, # 218347, 951 Indianwood Road, Lake Orion,
MI 48362.

                                               s/Darlene Chubb_____
                                               Judicial Assistant

Report and Recommendation
Defendants' Motion for Summary Judgment
*Horacek v. Wilson*; 07-13822